UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DOLORES SHARPE,

                             **DOCKET NO.:** CV-15-6446
                             (GRB)(AYS)

                   *Plaintiff,*


-against-

COUNTY OF NASSAU,
NASSAU COUNTY POLICE DEPARTMENT,
CHARLES VOLPE, In His Individual And Official
Capacities, VICTOR GLADITZ In His Individual
And Official Capacities and Former Police Commissioner
COMMISSIONER THOMAS DALE,
In His Individual And Official Capacities.

                  *Defendants.*
-------------------------------------------------------------X

### PLAINTIFF'S STATEMENT OF DISPUTED FACTS
### IN OPPOSITION TO COUNTY DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1
### AND COUNTER-STATEMENT OF FACTS

Pursuant to Local Rule 56.1 for the Eastern District of New York, Plaintiff Dolores Sharpe

submits this Statement of Disputed Material Facts in Opposition to Defendants' County of Nassau,

Charles Volpe, Victor Gladitz, Commissioner Thomas Dale.   (collectively "DEFENDANTS")

Motion for Summary Judgment. Further, Plaintiff respectfully avers that, in addition to those

assertions made by the Defendants which are disputed here, this document is provided, pursuant to

Local Civil Rule 56.1, as a Counter-Statement of Facts in support of Plaintiff's contentions that

genuine facts are in dispute. The facts and contentions listed below in Plaintiff's Counter Statement

are not all-inclusive of each and every disputed issue, but are provided to demonstrate the level and

complexity of the disputed issues which permeate this case. Further, references provided in support

of each of the issues raised are not all-inclusive, and are offered to comply with the Local Rule.

Further, Plaintiff objects to the Defendants' improper misstatement of facts so as to lead to deceptive and inaccurate conclusions. Finally, Plaintiff do not concur with the subject titles adopted by Defendant and only utilize them for purposes of recognition and consistency.

## UNDISPUTED AND DISPUTED FACTS

1. Plaintiff is a former Police Officer with the Nassau County Police Department ("the Department"). See Complaint at ¶ 9; Sharpe Dep. at pp. 18, 27 .

   *Plaintiff's Response:*

   Not disputed.

2. The County of Nassau is a municipal corporation organized and existing pursuant to the laws of the State of New York. *See* Answer at ¶ 10.

   *Plaintiff's Response:*

   Not disputed.

3. The Department is an administrative arm of the County. *See* Answer at ¶ 11.

   *Plaintiff's Response:*

   Not disputed.

4. Thomas Dale is the former Police Commissioner of the Department. See Dale Dep. At pp.9-10.

   *Plaintiff's Response:*

   Not disputed.

5. As Commissioner, Mr. Dale was the highest-ranking officer in the Department. *See id.* at p.99.

   *Plaintiff's Response:*

   Not disputed.

6. At the time of the incident in question, Charles Volpe was a police officer employed by the Nassau

County Police Department. *See* Volpe Dep. at pp. 9-11, 17-18.

> *Plaintiff's Response:*

> Not disputed.

7 . Victor Gladitz is, and was at all times relevant to this action, a Nassau County police officer. *See* Gladitz Dep. at p.14.

> *Plaintiff's Response:*

> Not disputed.

**Plaintiff s County Employment**

8. Plaintiff began her County employment as a police officer on March 31,1995 when she began training at the Police Academy. *See* Sharpe Dep. at p. 18.

> *Plaintiff's Response:*

> Not disputed.

9. Approximately four years into her service with the County, Plaintiff became a Community Liaison Officer. *See* Sharpe Dep. at p.21.

> *Plaintiff's Response:*

> Not disputed, however Plaintiff served in the hamlet of Roosevelt in that capacity.

10. In approximately 2006 or 2007, Plaintiff took on an instructor role with the Community Affairs Bureau. *See* Sharpe Dep. at p.21.

> *Plaintiff's Response:*

> Not disputed to the extent that plaintiff taught the Great Program in the 4th and 6th Grades.

11. After working in Community Affairs for approximately five years, Plaintiff requested and was granted a transfer to the Applicant Investigations Unit. *See* Sharpe Dep. at p.22.

3

> _**Plaintiff's Response:**_

Not disputed.

12. While working in Applicant Investigations, which was located at Nassau Community College, Plaintiff was responsible for investigating the background of potential County civil service employees. _See_ Sharpe Dep. at p.24.

> _**Plaintiff's Response:**_

Not disputed.

## Plaintiffs Training to Off-Duty Incidents

13. Both during the Police Academy and in subsequent trainings after completing the Academy, Plaintiff received training in how to conduct herself while off-duty and encountering an on-duty officer. _See_ Sharpe Dep. at pp.69-70,325-26,330; Nassau County Police Department Off-Duty and Plain Clothes Encounters Course materials; Nassau County Police Academy training materials.

> _**Plaintiff's Response:**_ Disputed in part to the extent that the training contemplated that any such encounters would not be abusive and riddled with racism and abusive sexist actions and statements as fully explained by Plaintiff in her deposition. _See_ Sharpe Dep. at pp. 71

14. Plaintiff's training was to immediately identify herself as an off-duty officer. _See_ Sharpe Dep. at pp. 70, 330; Off-Duty and Plain Clothes Encounters materials; Nassau County Police Academy training materials.

> _**Plaintiff's Response:**_

Disputed in part to the extent that the training contemplated that any such encounters would not be abusive and riddled with racism and abusive sexist actions and statements as fully explained by Plaintiff in her deposition. _See_ Sharpe Dep. at pp. 71

4

15. Plaintiff s training in off-duty encounters instructed that if someone identified himself/herself as an off-duty police officer, the on-duty officer is not expected to take his/her word for it but rather request the individual's police credentials. *See* Sharpe Dep. at p.72.

### *Plaintiff's Response:*

Disputed as this is a misstatement of the facts and as Plaintiff clearly stated , "[i]t actually would -- would really vary as to what the circumstance is. If -- if there is a situation that there was a crime that had happened and someone is telling me that they are a police officer, I would pretty much want to have clear identification. However, in this instance, this was a very different circumstance. I had done nothing wrong. I was a shopper for Black Friday going to a store, and I was harassed and followed by an officer who -- for whatever reason -- felt necessary to come after me after I had already identified myself to him as a police officer. He had an opportunity at the time when I did show him to inquire further. He chose to curse at me and call me a fucking moron.   So -- so the same training that I had, those officer also had. And their training, obviously they didn't adhere to -- to the -- to anything." *See* Sharpe Dep. at pp.71-72, also pp.330-333

16. She was also trained to immediately show her identification in a slow and methodical manner to prove that she was an officer. *See* Sharpe Dep. at pp.70,330; Off-Duty and Plain Clothes Encounters materials; Nassau County Police Academy training materials.

### *Plaintiff's Response:*

Disputed in part as the testimony was to show identification in that fashion "if asked." Also, Defendants reference documents without referring to Bates numbers, page number or other form or other methods of evaluation as to what it is on which Defendants rely.  *See* Sharpe Dep. at p.330.

17. Plaintiff would expect an on-duty officer to request to see her identification or credentials while she was off-duty. *See* Sharpe Dep. at p.72.

### *Plaintiff's Response:*

Disputed to the extent that nothing referenced in this statement about "off-duty" is mentioned on page 72 of Plaintiff's deposition.

18. Falsely identifying one-self as a police officer is a criminal act. See Sharpe Dep. at p. 338.

### *Plaintiff's Response:*

Not disputed as a general principle, however this question was objected to during the deposition of Plaintiff as is calls for legal conclusion and the reference here fails to include Plaintiff's full response. Further, intentionally refusing to accept proof of identification in order to abuse, harass, and/or retaliate, or due to race, color and/or gender is a violation of the law and the Department's civilian's rights and non-discrimination rules and policies.

19. Given the seriousness of such an offense, Plaintiff was trained not to accept anyone's word that he/she is a police officer. *See* Sharpe Dep. at p.72.

### *Plaintiff's Response:*

Disputed as Plaintiff's testimony was, "No. Not that you would accept **just** their word." (Emphasis added)*See* Sharpe Dep. at p.72.

20.If an officer reasonably believes that someone is impersonating an officer, it is appropriate for the officer to conduct an investigation, including conducting a car stop. *See* Sharpe Dep. at pp.340-41.

### *Plaintiff's Response:*

Not disputed.

6

21. Plaintiff also received training in how to behave if she was off-duty and pulled over by another officer. *See* Sharpe Dep. at p.76.

> **_Plaintiff's Response:_**
>
> Not disputed.

22. As an experienced patrol officer, Plaintiff expects that the subject of a traffic stop would remain in his/her vehicle. *See* Sharpe Dep. at pp.73-74.

> **_Plaintiff's Response:_**
>
> Disputed as the term "experienced patrol officer" was not referenced on those pages or in the question, and the Defendants misquote Plaintiff as her actual statement was that "It is the **hope** that the person would remain in the vehicle and not -- you know, not necessarily does that happen." (Emphasis added) *See* Sharpe Dep. at pp.73-74.

23. Plaintiff would have a greater fear for her personal safety if someone who was being pulled over immediately exited his/her vehicle and approached the police vehicle. *See* Sharpe Dep. at p.75.

> **_Plaintiff's Response:_**
>
> Disputed as the Defendants misquote Plaintiff and alter the content of her statement. Plaintiff testified that "[p]erhaps I might have had a level of -- a slight level of escalation of -- of fear." Plaintiff did not indicate that she would have "a greater fear for her personal safety." *See* Sharpe Dep. at p.75.

24. It is appropriate for a police officer to intervene where he observes a subject exiting her vehicle to approach another officer that made a traffic stop. *See* Sharpe Dep. at pp.431-32.

> **_Plaintiff's Response:_**
>
> Disputed in part and Not disputed in part. The question asked leading to what the Defendants

now seek to rely on was objected to as it was an inappropriate and incomplete hypothetical. It is disputed further as it fails to provide Plaintiff's complete response which was, "[w]ould it be appropriate if it was such that either of the two officers felt I was such a danger or such a -- which I now know that they actually conspired, so that they could stop me --." *See* Sharpe Dep. at pp.431-32.

25. Plaintiff was trained to cooperate with all directions of the on-duty officer. *See* Sharpe Dep. at pp.76, 330.

### *Plaintiff's Response:*

Disputed in part and not disputed in part. Plaintiff was not asked about "**all** directions" as stated in this statement. Further, Plaintiff was asked ,"[a]re you supposed to do everything that the challenging officer says?", which is what Plaintiff responded to when she testified that, "In an ideal scenario, yes. If it's going to put me in danger, if it's going to cause other people to be in danger, then these specifics would have to be amended." *See* Sharpe Dep. at pp.76, 330.

26. As part of her training in on-duty, off-duty incidents, Plaintiff was trained that the on duty officer was to treat all persons as a suspect until the officer had clear identification of the off-duty officer. *See* Sharpe Dep. at pp.331-34.

### *Plaintiff's Response:*

Disputed as Plaintiff actually testified as follows: "Because you should not treat as person as a subject with first not understanding that that person is a human being first. So that person should be treated as the human being, and then you're not really sure who they are; so I wouldn't say that they should be treated as a subject, but just as an unidentified individual." *See* Sharpe Dep. at p.333.

8

**Plaintiff is Arrested**

27 . On November 29,2013, after her shift that day, Plaintiff traveled to a National Wholesale Liquidators store and then to the Dollar Tree store on Hempstead Turnpike in West Hempstead. *See* Sharpe Dep. at pp.32-33,234-35.

    ***Plaintiff's Response:***

    Not disputed.

28. Plaintiff was driving her blue Nissan Xterra on this day. *See* Sharpe Dep. at p. 236.

    ***Plaintiff's Response:***

    Not disputed.

29.Plaintiff's vehicle had tinted windows. *See* Sharpe Dep. at p.238.

    ***Plaintiff's Response:***

    Not disputed.

30. Plaintiff entered the parking lot to the Dollar Tree store from Mayfair Avenue and encountered a Nassau County Police vehicle driven by Officer Charles Volpe. *See* Sharpe Dep. at pp. 33-34.

    ***Plaintiff's Response:***

    Not disputed to the extent that Plaintiff had a brief exchange, but it was not an "encounter" as referenced in paragraph 30. *See* Sharpe Dep. at p. 38.

31. At that time, Plaintiff did not know Officer Volpe. *See* Sharpe Dep. at p. 35.

    ***Plaintiff's Response:***

    Not disputed.

32. Officer Volpe's Nassau County Police vehicle was blocking Plaintiff from turning into the parking space she was attempting to enter with her vehicle. *See* Sharpe Dep. at pp.250-51; Volpe

Dep. at p.25.

> ### *Plaintiff's Response:*

> Not disputed.

33. When their cars were near each other, Officer Volpe could not see directly into the vehicle because of the tinting on the windows of Plaintiff s car. *See* Volpe Dep. at p.26; Volpe 7/10/14 Hearing Testimony at p.71.

> ### *Plaintiff's Response:*

> Disputed this statement fails to indicated a point in time to which Defendants are referring as the cars, further Defendant Volpe could see directly into the vehicle because he requested that Plaintiff roll her window down, which she did.  No mention of any tinted windows was made then or at anytime on the scene. *See* Sharpe Dep. at pp. 251-253; 33-38, 104-105.

34. As their cars were side-by-side and facing each other, Officer Volpe indicated to Plaintiff to roll down her window so that he could speak to her. *See* Sharpe Dep. at pp.34,37; Volpe Dep. at pp. 26-27; Volpe 7/10/14 Hearing Testimony at p.21; Volpe 3/6/15 Statement at ¶ 3.

> ### *Plaintiff's Response:*

> Not disputed.

35. Plaintiff claims that she rolled down her window "as a courtesy." See Sharpe Dep. at p. 36.

> ### *Plaintiff's Response:*

> Disputed as Plaintiff does not "claim[ ]" that she rolled down her window, she did indeed roll down her window "as a courtesy." See Sharpe Dep. at p. 36.

36. When Plaintiff rolled down her window, Officer Volpe asked Plaintiff to move her vehicle because it was obstructing his view in connection with an investigation in which he was then

engaged. *See* Sharpe Dep. at p.37; Volpe Dep. at p.27; Volpe 3/6/15 Statement at ¶ 3.

*Plaintiff's Response:*

Disputed as Defendant Volpe did not **ask** Plaintiff to move her vehicle, instead, "Officer Volpe stated to [Plaintiff] that [she] was obstructing his view from his investigation." *See* Sharpe Dep. at p.37

37. Plaintiff responded that she was just trying to park her car. *See* Sharpe Dep. at p.37; Volpe 3/6/15 Statement at ¶ 3.

*Plaintiff's Response:*

Disputed in part as Plaintiff responded that, "I am not trying to obstruct your investigation. I am just trying to park."*See* Sharpe Dep. at p.37 *See* Sharpe Dep. at p.37

38. Plaintiff appeared to Officer Volpe to be upset during this interaction. See Volpe Dep. at p. 28.

*Plaintiff's Response:*

Disputed as the referenced to "this interaction" does not provide a clear time frame.  Further, Plaintiff testified that:

Q: And do you roll down your window right away?

A: Yes.

Q: Are you annoyed at all?

A: No. *See* Sharpe Dep. at p.252

39. Plaintiff then parked her car in an open parking space and Officer Volpe moved his vehicle. *See* Sharpe Dep. at pp. 37-38; Volpe Dep. at p.29.

*Plaintiff's Response:*

Disputed to the extent that while the Plaintiff parked her car, the reference to Defendant

11

Volpe moving his vehicle is out of sequence as Defendant Volpe moved his vehicle first and allowed Plaintiff to park. See Sharpe Dep. at pp. 37-38

40. After parking, Plaintiff exited her car and walked to the front of the store when she heard someone attempting to get her attention. *See* Sharpe Dep. at p. 38; Sharpe 4/1/15 Statement at ¶ 5.

**_Plaintiff's Response:_**

Disputed as Plaintiff walked "towards the entrance of the door" not the "front of the store." Further, what Plaintiff heard was not someone "attempting to get her attention", this is a mischaracterization. Instead what Plaintiff heard was, "an individual behind me, very roughly. Yo. Yo Yo, you. And as I turned to see who was saying that and to whom they were addressing it to, I then noticed that was Officer Volpe..." *See* Sharpe Dep. at p. 38. She also testified that, "Well, he pretty much barked the words out. If you're going to speak to a person, a human being, another person, you don't yo, yo, you. We're all adults."*See* Sharpe Dep. at p. 39.

41. When she turned around, Plaintiff saw Officer Volpe, who told her to come over to his vehicle, which was now parked in front of the store. *See* Sharpe Dep. at pp. 38-39.

**_Plaintiff's Response:_**

Disputed in part as the police vehicle had pulled up and was standing in front of the parking lot entrance door to the store and was not parked. *See* Volpe Dep. at pp. 31-35. Further Defendant Volpe said "come here" or "come over here" or words to that effect. *See* Sharpe Dep. at p. 38.

42.Plaintiff approached the driver's side window of Officer Volpe's vehicle. *See* Sharpe Dep. at p.40; Volpe Dep. at pp.34-35; Dollar Tree video footage.

**_Plaintiff's Response:_**

Not disputed.

43. Plaintiff told Officer Volpe that she was a "member of service." *See* Sharpe Dep. at p.41; Volpe 7/10/14 Testimony at p.46.

### *Plaintiff's Response:*

Disputed as Defendants mischaracterize what Plaintiff did.  As she informed Defendant Volpe that she was a "member of service" she also showed her badge/ID and asked if he needed any help and if she could assist with his investigation. *See* Sharpe Dep. at p.41

44. During this interaction, Plaintiff cursed at Officer Volpe. *See* Volpe Dep. at pp. 35-36; Volpe 3/6/15 Statement at ¶ 3; Sharpe Dep. at pp. 45, 260; Sharpe 4/1/15 Statement at ¶ 6.

### *Plaintiff's Response:*

Disputed to the extent that Defendants fail to provide a clear sequence of events and that Plaintiff repeated the curses leveled against her. Once Plaintiff identified herself, Defendant Volpe cursed at Plaintiff, saying " he did not care who the fuck I was or what the fuck I did. My response to him was if this is the way that you treat a member of service, then fuck you. " *See* Sharpe Dep. at pp. 41 and then when Plaintiff responded, he then shouted "that is why you get no respect, you fucking moron." *See* Sharpe Dep. at pp. 41  which is known to be a racially laced insult. Factually, The history in the word moron and his application of it is fueled by his bigoted action of going to get his partner and coming back to taunt and harass Plaintiff, addressing her as a black woman not fit to be respected.  "Moron" is commonly understood used to describe someone who has made a decision that is perceived as unwise, or to scold oneself over a mistake or slipup. However, the origins of "moron" are far more sinister.

The term is attributed to psychologist and eugenicist Henry H. Goddard, who used it to describe "feeble-minded" individuals. It is closely tied to the United States's involvement in

eugenics, a scientific term, meaning "well-born," that describes the belief that the human population can be controlled by breeding to increase the occurrence of desirable heritable characteristics. It focuses on eliminating "undesirable" individuals, singling out unmarried mothers, people of color, the poor, and those with disabilities. Labeled as morons, Southern black women were sterilized en masse, often without consent, for much of the 20th century. It was a practice so common that it received a nickname: a "Mississippi appendectomy." The 'Mississippi Appendectomy', was the medical practice  in the 1920s-1980s that provided involuntary sterilization to poor black women who were deemed unfit to reproduce.. The reference to a Black person as a moron has deep rooted levels of hate, racial inferiority and disrespect that cut deep and unmask levels of abuse and sanctioned horrors that Ms. Sharpe found offensive.

With the passage of the Immigration Act of 1924, eugenicists for the first time played an important role in the Congressional debate as expert advisers on the threat of "inferior stock" from eastern and southern Europe. The act, inspired by the eugenic belief in the racial superiority of "old stock" white Americans as members of the "Nordic race" (a form of white supremacy), strengthened the position of existing laws prohibiting race-mixing.[1]

45. Plaintiff walked away from Officer Volpe's vehicle and entered the Dollar Tree store while he was speaking to her. *See* Sharpe Dep. at p. 46; Volpe Dep. at p.36.

### ***Plaintiff's Response:***

Disputed as Plaintiff walked away,  Defendant Volpe was not speaking to her, he later yelled

---

[1] (Watson, James D.; Berry, Andrew (2003). DNA: The Secret of Life. Alfred A. Knopf. pp. 29–31. ISBN 978-0-375-41546-3.; Paul;"Eugenics Laws Restricting Immigration," Archived 4 March 2016 at the Wayback Machine, Eugenics Archive.

at her as she was entering the store. *See* Sharpe Dep. at pp. 41, 46.

46. Plaintiff's interaction with Officer Volpe near the front entrance to the Dollar Tree was captured on a surveillance video (without audio) kept by the Dollar Tree. *See* Sharpe Dep. at pp.109-10; Dollar Tree video footage.

> ***Plaintiff's Response:***

> Not disputed.

47. Based upon the way that Plaintiff behaved and spoke to him, Officer Volpe did not believe that Plaintiff was a police officer. *See* Volpe 7 /10/14 Testimony at p. 51; Volpe 3/6/15 Statement ¶ 4; Sharpe Dep. at p. 338.

> ***Plaintiff's Response:***

> Disputed as this fails to reference Defendant Volpe's actions and is strewn with assumptions and insinuations that Ms. Sharpe was required to respond in an accepting way to being told that she, as a Black Woman, is not entitled to respect and that she is a "fucking moron." The idea that Ms. Sharpe's non-acceptance of be abuse is some how inappropriate "behav[ior]" is not a fact, but more of a clear indication of Defendant Volpe's mind set and biased system of beliefs. *See* Sharpe Dep. at pp.38-41.

48. Plaintiff was in the store for only a few minutes. *See* Sharpe Dep. at p.46; Dollar Tree video.

> ***Plaintiff's Response:***

> Not disputed.

49. Upon exiting the store, Plaintiff walked directly to her car and did not observe any police vehicle in the parking lot. *See* Sharpe Dep. at pp.46-47.

*Plaintiff's Response:*

Not disputed.

50. While Plaintiff was in the store, Officer Volpe contacted Officer Gladitz. *See* Volpe Dep. at pp. 37 -38; Volpe 3/6/15 Statement at ¶ 6; Gladitz 3/7/15 Statement at ¶ 3.

*Plaintiff's Response:*

Disputed to the extent that Defendants intend the Court to believe that Defendant Volpe happened to contact Defendant Gladitz. Rather the facts are that he called Defendant Gladitz on his private cell phone and then met up to construct a plan to harass and abuse Plaintiff. (Volpe Dep. 39:25- 40:4) However, Defendant Gladitz disputes saying, "I was going to meet him and we saw each other so we ended up there." When asked, "When you say you were going to meet him, why were you going to meet him?" His response is "[i]n regards to an auto accident." Prior to them meeting at the Firehouse Defendant Gladitz testifies there was no mention or conversation with Defendant Volpe concerning his interaction with who we now know is Police Officer Sharpe.  See Gladitz Dep. at. p. 37-39.

51. Officer Gladitz was approximately one block away from the Dollar Tree store at a firehouse. *See* Gladitz Dep. at p.36; Volpe Dep. at p. 4l; Volpe 3/6/15 Statement at ¶ 7; Gladitz 3/7/15 Statement at ¶ 3.

*Plaintiff's Response:*

Not disputed.

52. Officers Volpe and Gladitz then spoke face-to-face and decided to further investigate based upon Plaintiff's behavior. *See* Volpe Dep. at pp.4l-43:, Gladitz Dep. at pp. 35, 39-40,49; Volpe 3/6/l5 Statement at ¶ 7 ; Gladitz 3/7/l5 Statement at ¶ 3.

16

**_Plaintiff's Response:_**

While the Defendants did speak to each other from their respective car windows (See Gladitz Dep. at pp. 35-36) it is Disputed that the Defendants "decided to further investigate based upon Plaintiff's behavior." In fact, the decision was not to investigate. What they called investigation was pretext to harass and abuse Plaintiff without advising a superior, dispatch or doing anything official which would authorize them to conduct a so called "further investigation." After meeting Defendant Gladitz at the firehouse, Defendant Volpe stated that there was a decision made by one or both of them to go back where the interactions with Plaintiff occurred. (_See_ Volpe Dep. 43). Defendant Volpe stated that he wanted to show Defendant Gladitz where the interaction occurred. (_Id._).

53. As she was pulling out of the parking lot and onto Mayfair Avenue, Plaintiff observed the turret lights from Officer Volpe's vehicle flashing and she pulled into the shoulder of Mayfair Avenue. _See_ Sharpe Dep. at pp.47-48; Volpe Dep. at p.54.

**_Plaintiff's Response:_**

Disputed. At the time Ms. Sharpe observed the flashing lights of the police vehicle, she did not know it was officer Volpe's vehicle. Ms. Sharpe did not realize that it was the same vehicle she encountered in the parking lot until after she pulled over onto the shoulder of Mayfair, and not into the shoulder.   Sharpe Dep. 49:2-6.

54. Officer Volpe decided to pull Plaintiff s car over because of the excessive tint of her windows and because he felt obligated to investigate her claim that she was a police officer in light of her behavior. See Volpe 7/10/14 Testimony at pp. 50-51, 71 .

*Plaintiff's Response:*

Disputed as at no time did Defendants mention anything about tinted windows at the time they pulled Plaintiff over.  The claim of excessive tinted windows was not raised until well after the arrest of Plaintiff as it pretext and cover up for the wrongful actions of Defendants. Plaintiff's car was sitting in the parking lot and Defendants never issued a ticket at that time.  No ticket was provided to Plaintiff at the time of her arrest. No mention of any tinted windows was made then or at anytime on the scene.  *See* Sharpe Dep. at pp. 251-253; 33-38, 104-105.

55. Immediately after pulling over, Plaintiff exited her vehicle and approached Officer Volpe's police vehicle. *See* Sharpe Dep. at p.49; Volpe Dep. at p. 61; Volpe 7/10/14 Testimony at p. 18; Volpe 3/6/15 Statement at ¶ 7; Gladitz 3/7/15 Statement at ¶ 3.

*Plaintiff's Response:*

Disputed as Plaintiff does not indicate she "immediately" exited her car and she never actually approached Defendant Volpe's vehicle. Plaintiff "never had an opportunity to complete [her] approach because [she] was then manhandled very roughly by a second officer, now known to [her] as Victor Gladitz." *See* Sharpe Dep. at pp.49-50.

56. As she moved towards Officer Volpe's police vehicle, she was screaming, yelling and cursing. *See* Sharpe Dep. at pp.264-66; Volpe Dep. at pp. 61-62; Gladitz Dep. at pp. 43,45, 47 .

*Plaintiff's Response:*

Disputed in part as Plaintiff testified that she "might have said what the fuck are you doing this for?". Further, Volpe states that Plaintiff stated "Why am I getting pulled over?  I already told you I'm a Cop." *See* Sharpe Dep. at p.266; See Hearing Transcript at p. 80.

57. When she got out of her car, Plaintiff yelled at Officer Volpe as to why he had pulled her over.

*See* Sharpe Dep. at pp. 51; 265; Volpe Dep. at p.62; Volpe 7/10/l4 Testimony at p. 18; Volpe 3/6/15

Statement at ¶ 7 ; Gladitz 3/7/15 Statement at ¶ 3.

> ***Plaintiff's Response:***

> Not disputed.

58. As she was yelling at Officer Volpe, Plaintiff used the word "fuck." *See* Sharpe Dep. at p.

264;Volpe Dep. at p.62; Volpe 7/l0/14 Testimony at pp. 18-19; Volpe 3/6/15 Statement at ¶7.

> ***Plaintiff's Response:***

> Disputed in part as Plaintiff testified that she "might have said what the fuck are you doing

this for?". *See* Sharpe Dep. at p.266

59. While Plaintiff was approaching his police vehicle, Officer Volpe was still in his vehicle. *See*

Sharpe Dep. at p.49; Gladitz Dep. at pp.43,45,47; Volpe Dep. at pp. 6l-64.

> ***Plaintiff's Response:***

> Disputed to the extent that Plaintiff testified that "he was just about to get out of his vehicle."

*See* Sharpe Dep. at p.49 and did emerge from his car as she was grabbed by Gladitz.

Q:Okay. When you say that Officer Gladitz put his hands on you, was Officer Volpe still in his car?

A: At this point in time, he had exited his vehicle. *See* Sharpe Dep. at p.51

60. As she was approaching Officer Volpe's vehicle, Plaintiff was intercepted by Officer Victor

Gladitz, who prevented her from further confronting Officer Volpe. *See* Sharpe Dep. at pp. 49-50;

Giaditz Dep. at pp. 47-48; Volpe Dep. at p. 63.

> ***Plaintiff's Response:***

> Disputed in part as Plaintiff "never had an opportunity to complete [her] approach because

[she] was then manhandled very roughly by a second officer, now known to [her] as Victor Gladitz."

*See* Sharpe Dep. at pp.49-50. Additionally the meaning of "confronting" is not provided nor is it referenced in the question or answers provided by Plaintiff Gladitz did forcefully grab Ms. Sharpe which prevented her from completing her approach to Volpe's 504 vehicle. *See* Sharpe Dep. at p. 49-50. Defendant Volpe testified that Plaintiff was told to get back in her car which she did based on his instruction and Plaintiff followed his directions. *See* Hearing Transcript at pp. 80-81.

61. Plaintiff did not previously know Officer Gladitz. *See* Sharpe Dep. at p. 50.

> ***Plaintiff's Response:***
>
> Not disputed.

62. Officer Gladitz asked Plaintiff more than once to calm down. *See* Sharpe Dep. at p.404; Gladitz Dep. at p.47; Volpe Dep. at pp.63-64; Volpe 3/6/15 Statement at ¶ 7;" Gladitz3/7/l5 Statement at ¶ 3.

> ***Plaintiff's Response:***
>
> Disputed as this statement fails to allege when it is that Defendant Gladitz claims to have told Plaintiff to "calm down." If the allegation refers to at the time that first interactions when Defendants pulled Plaintiff over, that is not disputed.

63. To this point, Plaintiff had not yet identified herself as a police officer to Officer Gladitz. *See* Sharpe Dep. at p.67.

> ***Plaintiff's Response:***
>
> Disputed as the reference to "had not yet" fails to provide a proper sequence and define when Defendants are referring to. Further, as Defendants admit that Plaintiff's identification of herself as an officer was made known to Defendant Gladitz by Defendant Volpe from his conversations with Defendant Gladitz prior to pulling Plaintiff over, this previous identification was imputed to

Defendant Gladitz. *See* Volpe Dep. at 39-40, 44-45, 50.

64. Plaintiff then stated she was a "cop," to which Officer Gladitz stated that he did not know who she was. *See* Sharpe Dep. at pp. 52,325; Gladitz Dep. at p. 48; Gladitz3/7/15 Statement at ¶ 3.

> ### *Plaintiff's Response:*
>
> Not disputed.

65. Plaintiff had not, to this point, taken out her police identification or badge to show Officer Gladitz. *See* Sharpe Dep. at p. 69; Gladitz Dep. at p. 55; Volpe 3/6/15 Statement at ¶7.

> ### *Plaintiff's Response:*
>
> Disputed as Plaintiff had not been asked to produce her identification and already shown her police identification to Volpe and he did not care "who the fuck [she] was and what the fuck [she] did." *See* Sharpe Dep. at p. 69.

66. Plaintiff was admittedly upset and cursed at Officer Gladitz. See Sharpe Dep. at p.406; Gladitz Dep. at p. 47 ; Gladitz 3/7/15 Statement at ¶ 4.

> ### *Plaintiff's Response:*
>
> Disputed as Defendants fail to place when it is they claim that this sentence refers. Further, Plaintiff did not curse "at" Defendant Gladitz, she indicates she might have use a curse word, but it if she did, it was not "at" Defendant Gladitz. *See* Sharpe Dep. at p.266

67 . After Officer Volpe got out of his vehicle and approached, Plaintiff stated that she was a member of service. *See* Sharpe Dep. at p. 53; Volpe Dep. at p. 65; Gladitz 3/7/15 Statement at ¶5.

> ### *Plaintiff's Response:*
>
> Not disputed to the extent that Plaintiff stated again that she was a member of service as she had done previously.

21

68. Officer Volpe indicated that he did not know or believe that Plaintiff was a police officer. *See* Sharpe Dep. at p. 53.

    ***Plaintiff's Response:***

    Not disputed.

69. During this exchange, Officer Volpe requested that Plaintiff show him her police identification. *See* Sharpe Dep. at pp. 54,335; Volpe Dep. at p. 66; Gladitz Dep. at p. 55.

    ***Plaintiff's Response:***

    Disputed as it is not indicated nor defined as to what point in time  "[d]uring this exchange" is referring.

70. Plaintiff understood that Officer Volpe wanted to confirm her identity when he requested her police identification. *See* Sharpe Dep. at p.336.

    ***Plaintiff's Response:***

    Not disputed.

71. Plaintiff reached into her pocket to retrieve and show her identification to Officer Volpe. *See* Sharpe Dep. at p. 55; Gladitz Dep. at p. 56; Gladitz 3//7/15 Statement at ¶ 6.

    ***Plaintiff's Response:***

    Disputed to the extent that both Ms. Sharpe and officer Gladitz reached into Ms. Sharpe's pocket to retrieve and show her identification to officer Volpe.  Sharpe Dep. 55:7-8.

72. After Plaintiff retrieved the identification from her pocket, Officer Volpe took the identification and Plaintiff's badge. *See* Sharpe Dep. at pp. 55-56; Volpe Dep. at pp. 68-70; Gladitz Dep. at p.57.

    ***Plaintiff's Response:***

    Not disputed.

73. When Officer Volpe took the identification, it broke away from the chain to which it was attached. *See* Sharpe Dep. at p. 58; Gladitz Dep. at p. 57; Volpe Dep. at p.70; Photo of chain; Volpe 7/10/14 Testimony at p.26; Volpe 3/6/15 Statement at ¶ 7.

> ### *Plaintiff's Response:*
>
> Disputed as to the characterization of "When Officer Volpe took the identification, it broke away from the chain." In fact, Officer Volpe snatched the identification out of Plaintiff's hand with such force that he broke the chain, it did not break on its own. *See* Sharpe Dep. p. 58.

74. Officer Volpe walked back toward his vehicle with the identification. *See* Sharpe Dep. at p. 58; Volpe Dep. at p. 72; Volpe 7/10/14 Testimony at pp. 24-25; Volpe 3/6/15 Statement at ¶ 7.

> ### *Plaintiff's Response:*
>
> Not disputed.

75. Plaintiff then placed her hands in her pockets. *See* Sharpe Dep. at p.347; Gladitz Dep. at p. 65; Gladitz 3/7/15 Statement at ¶ 6.

> ### *Plaintiff's Response:*
>
> Not disputed to the extent that while Officer Gladitz was holding her forearms, Plaintiff allowed you to put her hands back into your pockets? *See* Sharpe Dep. at p.347

76. Officer Gladitz placed his hands on Plaintiff's forearms while her hands were in her pockets. *See* Gladitz Dep. at pp.65-66; Gladitz 3/7/15 Statement at ¶ 6.

> ### *Plaintiff's Response:*
>
> Not disputed to the fact that Defendant Gladitz used force and grabbed Plaintiff's arms, however any characterization that he "placed his hands" on Plaintiff's forearms is not accurate as to what he actually did. *See* Sharpe Dep. at p. 62-64.

77. At some point, Plaintiff's hands came out of her pockets. *See* Sharpe Dep. at p.62; Gladitz Dep. at pp. 65-66; Gladitz 3/7/15 Statement at ¶ 6.

**_Plaintiff's Response:_**

Disputed as Plaintiff's did not "come out of her pockets", they were pulled out of her pockets by the force and unauthorized touching of Defendant Gladitz. *See* Gladitz Dep. 65:17-19, 68:10-13; Sharpe Dep. at p. 62-64.

78. Plaintiff s right hand came out of her pocket to approximately shoulder level while the broken chain was in her hand. *See* Sharpe Dep. at pp. 62,65-66; Gladitz Dep. at 67; Gladitz 3/7/15 Statement at ¶ 6.

**_Plaintiff's Response:_**

Disputed as Plaintiff's right hand did not "come out of her pocket to approximately shoulder level", as Plaintiff hands were extracted with force from her pockets by Defendant Gladitz. *See* Gladitz Dep. 65:17-19, 68:10-13;  Sharpe Dep. at p. 62-64.

79.The chain was only a few inches from Officer Gladitz's face. See Sharpe Dep. at p. 66; Gladitz Dep. at p.70;GIaditz 3/7/l5 Statement at ¶ 6.

**_Plaintiff's Response:_**

Disputed as this entire chain claim is falsely stated and at no time did the chain come "only a few inches from Officer Gladitz's face." This claim is a pretext for and attempt to cover up the wrongful, violative and discriminatory actions taken against Plaintiff by Defendants. *See* Sharpe Dep. at p. 62-64; Volpe Dep. at p. 124.

80. Officer Gladitz stated that Plaintiff had tried to strike him with the chain and called her a bitch. *See* Sharpe Dep. at pp.77-78; Gladitz Dep. at pp.77,80; Volpe Dep. at p. 88; Volpe 3/6/15 Statement

at ¶ 7; Gladitz 3/7/15 Statement at ¶ 6; Partial recording.[2]

*Plaintiff's Response:*

Not disputed to the extent that Defendant Gladitz made the false claim and statement, and did use the discriminatory language of calling Plaintiff "you bitch." *See* Gladitz Dep. at p.79-80; Volpe Dep. at p. 88; Audio Tape Transcript at p. 2.

81. Plaintiff yelled and cursed at Officers Volpe and Gladitz during this exchange. *See* Sharpe Dep. at pp. 92-93 ; Gladitz 3/7/15 Statement at ¶ 6; Video.

*Plaintiff's Response:*

Disputed as Plaintiff responded to being cursed and quoted in her response the curses used by Defendants. *See* Audio Tape Transcript pgs. 1-4.

82. Officer Gladitz then placed Plaintiff in handcuffs. *See* Sharpe Dep. at p.78; Gladitz Dep. at p.71; Volpe Dep. at p.79; Volpe 7/10/14 Testimony at pp. 26-27; Volpe 3/6/15 Statement at ¶ 7; Gladitz3/7/15 Statement at ¶ 6.

*Plaintiff's Response:*

Disputed as the reference to "then placed Plaintiff in handcuffs" does not indicate what the "then" refers to. It appears from Defendants statement that the handcuffs followed the alleged "yelling and cursing" which is referenced in paragraph 81. That is not supported by the record.

83. Officer Volpe came out of his vehicle to assist with placing Plaintiff in handcuffs and then returned to his vehicle. *See* Sharpe Dep. at p. 79; Gladitz Dep. at p. 73; Volpe Dep. at p.79.

---

[2] A portion of the traffic stop was captured by a cell phone recording made by Officer Volpe. See Sharp Dep. At pp. 117-18, 122; Volpe Dep. At pp 72, 74-75; Partial [r]ecording. *Plaintiff's Response:* Not disputed.

*Plaintiff's Response:*

Disputed. Defendants are misquoting Plaintiff as on the page to which they cited, Plaintiff never stated that Volpe came out of his vehicle to assist Gladitz with the handcuffs. *See* Sharpe Dep. at p. 79

84. During the traffic stop, Plaintiff questioned Officer Volpe about how much time he had "on the job." *See* Sharpe Dep. at pp. 402-03; Volpe Dep. at p. 65; Partial recording.

*Plaintiff's Response:*

Disputed as there was never a "traffic stop" (*See* Volpe Dep. at p.50), further the Defendants fail to provide the proper and complete context for the quote which they suggest.

85. A third police vehicle, driven by Officer Anthony Carbone, arrived on the scene. *See* Sharpe Dep. at p 79; Volpe Dep. at pp. 91-92; Volpe 3/6/15 Statement at ¶ 8; Gladitz 3/7/15 Statement at ¶ 6.

*Plaintiff's Response:*

Not disputed.

86. Around the time that Officer Carbone arrived on scene, Plaintiff requested that a supervisor be called to the scene. *See* Sharpe Dep. at p.79.

*Plaintiff's Response:*

Disputed as Plaintiff requested a supervisor almost immediately upon being subjected to the mistreatment and abuse by Defendants Volpe and Gladitz.  Accordingly, this would not have been the first request made for a supervisor. *See* Sharpe Dep. at 79.

87. But Officer Volpe had already called for a supervisor. *See* Gladitz 3/7/15 Statement at ¶ 8.

*Plaintiff's Response:*

Disputed as stated above, Plaintiff had requested for a supervisor to be called several times

26

before Carbone was called to the scene. *See* Sharpe Dep. at 79.

88. Plaintiff told Officer Carbone that she was a member of service and did not understand what was happening, to which Officer Carbone replied that he was just there to assist. *See* Sharpe Dep. at p.82.

> ### *Plaintiff's Response:*
>
> Not disputed.

89. Plaintiff told Officer Carbone to remove the handcuffs, but he said he could not do that. *See* Sharpe Dep. at p.421.

> ### *Plaintiff's Response:*
>
> Not disputed.

90. Officer Carbone stayed with Plaintiff while Officer Volpe and Gladitz spoke at Officer Gladitz' vehicle. *See* Sharpe Dep. at p. 83; Volpe 3/6/15 Statement at ¶ 9.

> ### *Plaintiff's Response:*
>
> Not disputed.

91. According to Officer Carbone, Plaintiff called him a "fucking rookie." *See* Carbone 10/8/14 Statement.

> ### *Plaintiff's Response:*
>
> Disputed. Plaintiff had a brief conversation with Officer Carbone when he arrived on the scene and explained to him that she was a member of service, and did not curse at him let alone call him a "fucking rookie." *See* Sharpe Dep. at 82, 350.

92. Officer Volpe came over to Plaintiff to inquire if she had her service weapon. *See* Sharpe Dep. at p. 84; Volpe 3/6/15 Statement at ¶ 9.

*Plaintiff's Response:*

Not disputed.

93. Plaintiff advised, for the first time, that her service revolver was in a holster on her right hip. *See* Sharpe Dep. at p. 84-86, 88; Volpe 3/6/15 Statement at ¶ 9.

*Plaintiff's Response:*

Not disputed.

94. Plaintiff s service revolver was then removed from the holster and secured in Officer Volpe's vehicle. *See* Sharpe Dep. at p. 84; Volpe 3/6/15 Statement at ¶ 9.

*Plaintiff's Response:*

Not disputed.

95. Officer Gladitz inquired where Plaintiff worked within the Department, to which Plaintiff responded, "Applicant Investigations." *See* Sharpe Dep. at p.77; Gladitz 3/7/15 Statement at ¶ 8.

*Plaintiff's Response:*

Not disputed.

96. Sergeants Kevin Carroll and Gregory Boyce then arrived on scene. *See* Sharpe Dep. at pp. 80, 89; Volpe Dep. at p.91 Volpe 3/6/15 Statement at ¶ 10; Gladitz3/7/15 Statement at ¶¶ 10-1 l.

*Plaintiff's Response:*

Not disputed.

97. Sergeant Boyce spoke with Officers Volpe and Gladitz first and then spoke with Plaintiff about what happened. *See* Sharpe Dep. at p. 90; Volpe 3/6/15 Statement at ¶ 10; Gladitz3/7/l5 Statement at ¶ 10.

*Plaintiff's Response:*

Not disputed.

98. Sergeant Boyce also removed Plaintiff s handcuffs. *See* Sharpe Dep. at p.90; Volpe 3/6/15 Statement at ¶ 15.

*Plaintiff's Response:*

Not disputed.

99. Officer Volpe suggested that Plaintiff be taken as a 10-62 (mental health) based on what he perceived to be her aggressive, irrational and erratic behavior. *See* Volpe Dep. at pp. 86-87; Volpe 3/6/15 Statement at ¶ 13.

*Plaintiff's Response:*

Disputed to the extent that officer Volpe alleged, rather than perceived, that Ms. Sharpe's behavior was "aggressive, irrational and erratic.".

100. Sergeants Boyce and Carroll then transported Plaintiff to the Fourth Precinct. *See* Sharpe Dep. at p. 91; Volpe Dep. at p. 106; Volpe 3/6/15 Statement at ¶ 15; Gladitz 3/7/15 Statement at ¶ 12.

*Plaintiff's Response:*

Not disputed.

101. After arriving at the Fourth Precinct, Plaintiff was placed in the kitchen and then moved to the records room, with Sergeant Carroll watching her at all times. *See* Sharpe Dep. at p. 95.

*Plaintiff's Response:*

Not disputed.

102. Plaintiff spoke with her union representative and her Commanding Officer, who had called the Fourth Precinct to speak with her. *See* Sharpe Dep. at pp.96-97.

*Plaintiff's Response:*

Not disputed.

103. While meeting with her union representative, Plaintiff advised of her desire to speak with a lawyer. *See* Sharpe Dep. at p. 98.

*Plaintiff's Response:*

Not disputed.

104. Plaintiff was then photographed and fingerprinted before meeting with Sergeant Joanne Distler of Internal Affairs. *See* Sharpe Dep. at p. 98.

*Plaintiff's Response:*

Not disputed.

105. Officers Volpe and Gladitz informed the Internal Affairs Unit ("IAU") that they were comfortable with having Plaintiff referred to the Department's Employee Assistance Program rather than being charged. *See* Volpe 3/6/15 Statement at ¶ 17 .

*Plaintiff's Response:*

Disputed as this is inconsistent with the testimony where Defendant Volpe admits the following *See* Volpe Dep. at pp. 268-269:

Q: You signed and swore to criminal complaints against Ms. Sharpe, didn't you?
A: Yes.
Q: By swearing to those criminal complaints you swore the truth of those allegations that you claimed, correct?
A: That's correct.
Q: And those criminal complaints were part of the prosecution of Ms. Sharpe, correct?
A: Correct.
*********************************
Q Did you tell anybody that you didn't want to testify against Ms. Sharpe?
A I don't remember.
Q And you did testify against Ms. Sharpe, right?
A I did.

106. Fourth Precinct Lieutenant Jeffrey Douglas was instructed by his superiors to proceed with processing the arrest of Plaintiff. *See* Douglas 12/4/13 Statement at ¶ 6.

### *Plaintiff's Response:*

Plaintiff can neither dispute or affirm this claim.

107. After meeting with Plaintiff, an IAU officer informed Officers Volpe and Gladitz that the Department was proceeding with the processing of Plaintiff s arrest. *See* Volpe 3/6/15 Statement at ¶17 ; Gladitz 3/7/15 Statement at ¶ 14.

### *Plaintiff's Response:*

Not disputed.

108. It was not Officers Volpe or Gladitz' decision to process Plaintiff s arrest. *See* Volpe 3/6/15 Statement at ¶ 17; Volpe Dep. at p. 85.

### *Plaintiff's Response:*

Disputed as to "process Plaintiff's arrest"means. Both Gladitz and Volpe placed Ms. Sharpe in handcuffs (Gladitz Dep. at p. 73) and filed criminal charges against Ms. Sharpe (Volpe Dep. at p. 131).

109. IAU Sergeant Distler advised Plaintiff that she was being charged with resisting arrest. *See* Sharpe Dep. at p. 98.

### *Plaintiff's Response:*

Not disputed.

110. Plaintiff was charged with violations of Penal Law §§ 205.30 (Resisting Arrest) and 240.26(1) (Harassment in the second degree); and Vehicle and Traffic Law §240.26(l) (Tinted side windows). *See* Volpe Dep. at p. 131; Criminal Informations.

31

*Plaintiff's Response:*

Disputed as there was never any mention of tinted windows on the date of arrest and it was made known to Plaintiff after she left the 4th Precinct. *See* Sharpe Dep. at p.104-105.

111. Commanding Officer of the Fourth Precinct Inspector Joseph Barbieri then advised Plaintiff that then Commissioner Dale was suspending her for 30 days without pay. *See* Sharpe Dep. at p.99; Notification of Suspension.

*Plaintiff's Response:*

Not disputed.

112. Plaintiff signed a Department Notification of Suspension, acknowledging her suspension before being transported back to her personal vehicle. *See* Sharpe Dep. at p.99; Notification of Suspension.

*Plaintiff's Response:*

Not disputed.

113. Plaintiff also signed a Physical Condition Questionnaire, before being released from the Fourth Precinct, indicating that she did not suffer any physical injuries. *See* Sharpe Dep. at pp. 357-58,393; Physical Condition Questionnaire.

*Plaintiff's Response:*

Not disputed.

114. Plaintiff did not sustain any physical injuries from the incidents alleged in this lawsuit. See Sharpe Dep. at p.393.

*Plaintiff's Response:*

Not disputed.

115. Officers Volpe and Gladitz did not make any comments toward Plaintiff that were racial in

nature. *See* Sharpe Dep. at p.262.

### *Plaintiff's Response:*

Disputed as the questioning which lead to certain responses which are generally referenced were objectionable, vague, and lacked specificity. Plaintiff had already identified the race based comment and derogatory reference made to her about her. Further Defendants fail to include the previous page which included Plaintiff's identification of the race laced speech. *See* Sharpe Dep. at p.261:

Q: Okay. Did you know what he meant when he said this is -- when you say that he said this is what you get -- why you get no respect, you fucking moron. Did you have any idea what he meant by that?

A: Yes.

Q: What?

A: He meant to disrespect me as a woman, as a fellow officer, and as a black woman.

**Q: Did he make any racial comments to you, whatsoever?**

**A: I thought that was sufficient enough, to call me a fucking moron.** [Emphasis added] (*See* Sharpe Dep. at p.261  and Footnote 1 above)

In fact the comment referring to Plaintiff as "that's why **you** get no respect" was aimed at Plaintiff due to her race and gender as a Black woman and the "you" was intended to refer to the group. Further, referring to Plaintiff as a "fucking moron" were intended to be race based and racially laced. (See Response to Paragraph 44 above and Footnote 1 above).

### Commissioner Dale Suspends Plaintiff for 30 Days

116. On November 29,2013, then-Commissioner Dale received a phone call stating that Plaintiff had been arrested while off duty. *See* Dale Dep. at pp. 36, 39.

*__Plaintiff's Response:__*

Plaintiff can neither disputed or admit to this alleged fact.

117. Plaintiff had absolutely no interaction with Commissioner Dale on November 29, 2013. *See* Sharpe Dep. at p.143.

*__Plaintiff's Response:__*

Not disputed as Plaintiff had no direct interaction, but was informed what Defendant Dale was saying and allegedly doing.

118. Upon learning that she had been arrested, Commissioner Dale ordered that Plaintiff be suspended without pay because of the arrest. *See* Dale Dep. at pp. 36-37.

*__Plaintiff's Response:__*

Not disputed.

119. Commissioner Dale also immediately referred the matter to the Department's Internal Affairs Bureau. *See* Dale Dep. at p. 40.

*__Plaintiff's Response:__*

Plaintiff can neither dispute or admit to this alleged fact.

120. The referral was done verbally. *See* Dale Dep. at pp. 50-51.

*__Plaintiff's Response:__*

Plaintiff can neither dispute or admit to this alleged fact.

121. All police officer suspensions authorized by Commissioner Dale during his tenure were without pay. *See* Dale Dep. at p.73.

*Plaintiff's Response:*

Plaintiff can neither dispute or admit to this alleged fact.

122. It was Plaintiff's understanding that any officer arrested on criminal charges was suspended as a matter of course. *See* Sharpe Dep. at p. 104.

*Plaintiff's Response:*

Not disputed.

123. Plaintiff's suspension was for 30 days, at which point she returned to work. *See* Sharpe Dep. at p.230.

*Plaintiff's Response:*

Not disputed.

## The Criminal Trial

124. Plaintiff was charged with resisting arrest, harassment in the second degree and a traffic violation for having tinted side windows. *See* Sharpe Dep. at p. 105; District Court Information; Uniform Traffic Ticket.

*Plaintiff's Response:*

Disputed as Plaintiff was not initially charged with any VTL violation and the matter of tinted window was not initially mentioned or charged until after the arrest of Plaintiff. *See People v. Sharpe* Hearing dated July 10, 2014, pp.44-45; Volpe Dep. at p.114, 116, 128-131 .

125. The front driver and passenger windows and part of the front of Plaintiff s Nissan Xterra windshield were tinted. *See* Sharpe Dep. at p.238,242.

*Plaintiff's Response:*

Not disputed.

126. The tint was from an after-market tint job at an auto body shop in Bellmore. *See* Sharpe Dep. at p.239.

> ### *Plaintiff's Response:*
>
> Not disputed.

127. The traffic violation for having tinted windows was dismissed by the Nassau County District Court on May 27, 2014 because the prosecution failed to timely serve a supporting deposition for this charge. *See* May 27, 2014 Decision at p. 12.

> ### *Plaintiff's Response:*
>
> Not disputed that the alleged tinted windows violation was dismissed, however the charge was not valid to begin with, and Defendants misstate the Court's ruling as it was Defendant Volpe not the prosecution that failed to "timely serve and thereafter file a supporting deposition and proof of its service", which "render[ed] the simplified traffic information defective." *See* May 27, 2014 Decision at p. 12.

128. The Nassau County District Court expressly denied Plaintiff s request to dismiss the criminal charges based on a lack of probable cause. *See* May 27, 2014 Decision at pp. 12-13;

> ### *Plaintiff's Response:*
>
> Disputed as the Court ruled that "lack of probable cause for an arrest" "is by itself no basis for dismissal."(citations omitted) *See* May 27, 2014 Decision at pp. 12-13

129. Plaintiff went to trial with regard to the remaining charges in 2014, although the hearing was adjourned into 2015. *See* Sharpe Dep. at p. 106.

> ### *Plaintiff's Response:*
>
> Disputed as the reference supplied to support this claim does not reference any thing about

36

"the hearing" and confuses the testimony actually provided by Plaintiff. *See* Sharpe Dep. at p. 106.

130. A motion to dismiss was made by Plaintiff's counsel at the criminal trial. *See* Sharpe Dep. at p.411.

> ### *Plaintiff's Response:*
>
> Not disputed.

131 . The motion was denied and the case proceeded to a jury determination. *See* Sharpe Dep. at p.414.

> ### *Plaintiff's Response:*
>
> Not disputed.

132. Plaintiff was acquitted of in March 2015 after four days of jury deliberations. See Sharpe Dep. at pp. 107, 122-23.

> ### *Plaintiff's Response:*
>
> Not disputed.

## Plaintiff s Press Conferences

133. Following her arrest, Plaintiff and her attorney held a press conference at which she spoke out about alleged mistreatment of female minority officers in the Department. *See* Sharpe Dep. at p. 156.

> ### *Plaintiff's Response:*
>
> Not disputed.

134. Plaintiff and her attorney held another press conference after her acquittal in or about April 2015 to discuss the alleged mistreatment of female minority officers in the Department. *See* Sharpe Dep. at pp. 156-57.

*Plaintiff's Response:*

Not disputed as to Plaintiff holding a press conference, however the question was as to maltreatment not mistreatment and since Defendants do not provide the date for the matter referenced in statement 133, Plaintiff cannot agree that there was "another press conference."

**Plaintiff's County Employment After Her Acquittal**

135. Following her acquittal, Plaintiff was restored to full active duty in Applicant Investigations. *See* Sharpe Dep. at pp.122-23; Letter Restoring to Full Duty.

*Plaintiff's Response:*

Not disputed to the extent that Plaintiff was put back into her position, but as she details in her deposition it was not a full restoration as it was before, forcing her to retire. *See* Sharpe Dep. at pp.123-25.

136. Upon Plaintiff's acquittal, the Internal Affairs Bureau re-commenced and completed its investigation that was on hold during the criminal proceeding. *See* Sharpe Dep. at p. 140.

*Plaintiff's Response:*

Not disputed.

137. Plaintiff retired from her County employment in July 2015. *See* Sharpe Dep. at pp.27-28.

*Plaintiff's Response:*

Not disputed.

**Procedural History**

138. Plaintiff filed the Complaint on November 13, 2015. *See* Complaint.

*Plaintiff's Response:*

Not disputed.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff **DOLORES SHARPE** sets forth the following material factual assertions in opposition to the purported factual assertions set forth by Defendants in its Rule 56.1 Statement of Facts:

### The undisputed facts from Defendant Dale

139.   Commissioner Dale testified that "I don't see any major problem using curse words if you're off duty." (Dale Dep. 97).

140.   No one ever told Commissioner Dale that an offer to talk about what had happened to Plaintiff and her complaint made to the Department had been extend transmitted in a letter to him, and he believes he should have been told. (Dale Dep. 84-85)

141.   There was never any consideration given to the possibility that the officers had attempted to cover up their own wrongful actions by bringing charges against Plaintiff. (Dale Dep. 82)

142.   No one ever told him that the had been a statement that Ms. Sharpe had been abused and/or disrespected as an African-American woman. (Dale Dep. 85-86)

143.   Defendant Dale agrees that any allegation of racial bias by his officers is something that should be looked into very carefully. (Dale Dep. 82-83)

144.   Defendant Dale has no memory of anyone telling him that Ms. Sharpe complained that she was subjected to racial bias by Officer Vole's barrage of curses and insults. (Dale Dep. 83)

145.   Commissioner Dale testified that he that did not know there was an audio tape of insults and curses wrongfully said to Ms. Sharpe. (Dale Dep. 98).

39

146.    Commissioner Dale had notice of Defendants Volpe and Gladitz violating Ms. Sharpe's civil rights by a hand delivered December 2, 2013 letter yet failed to act on such. (*See* Letter to Thomas V. Dale dated December 2, 2013; Dale Dep. 82-86).

**The undisputed facts from Defendant Gladitz**

147.    Initially officer Gladitz had a face to face conversation with officer Volpe in which officer officer Volpe explained his interaction with Ms. Sharpe. (Gladitz Dep. 34-35).

148.    Gladitz stated that the conversation with Volpe about Ms. Sharpe took place in their respective RMPs near a firehouse. (Gladitz Dep. 35-36).

149.    Gladitz stated that he was already going to meet Volpe in order to reprint an accident report they had done prior to this subject incident. (Gladitz Dep. 37:8- 25).

150.    Gladitz stated that Volpe needed his help reprinting the auto accident form and that was their purpose for meeting. (Gladitz Dep. 38:2- 21).

151.    Prior to meeting Volpe at the firehouse, Gladitz had no conversation about Ms. Sharpe with Volpe. (Gladitz Dep. 38- 39).

152.    Gladitz stated that Volpe told him about an auto accident and that Ms. Sharpe said she was a police officer. (Gladitz Dep. 39-40).

153.    Gladitz and Volpe proceeded to where Volpe said the accident took place and/or where Ms. Sharpe was parked. (Gladitz Dep. 40:16-22 ).

154.    Gladitz drove his vehicle into the Dollar Tree parking lot. (Gladitz Dep. 41).

155.    Gladitz claimed he then exited the parking lot when he saw Volpe was in a "car stop situation" with Ms. Sharpe. (Gladitz Dep. 42- 44).

156.    Gladitz then parked his RMP directly behind Volpe's RMP and exited his vehicle.

(Gladitz Dep. 46-47).

157.   When Defendant Gladitz first approached Ms. Sharpe, he told her to calm down and relax. (Gladitz Dep. 47:4-5).

158.   Defendant Gladitz said Ms. Sharpe was stopped for many reasons including tinted windows on her vehicle and "she had stated she was a police officer." (Gladitz Dep. 48:3-16).

159.   Defendant Gladitz stated that he and Defendant Volpe investigated Ms. Sharpe without telling anyone at headquarters nor advising anyone on the police radio or dispatch that a stop had taken place. (Gladitz Dep. 49-50).

160.   Defendant Gladitz stated that Defendant Volpe physically grabbed Ms. Sharpe's ID from her. (Gladitz Dep. 57:19-24, 61:4-18).

161.   When officer Volpe grabbed Ms. Sharpe's identification, he caused Ms. Sharpe's chain to break. (Gladitz Dep. 57:19-24).

162.   Defendant Gladitz commanded Ms. Sharpe to remove her hands out of her pocket and after such command, physically placed his hands on her forearms to keep her hands in her pocket. (Gladitz Dep. 65:17-19, 68:10-13; Sharpe Dep. 62-64).

163.   Defendant Gladitz subsequently said "Oh fuck" and began to handcuff Ms. Sharpe. (Gladitz Dep. 71:9-17).

164.   Defendant Volpe helped Gladitz handcuff Ms. Sharpe. (Gladitz Dep. 73: 9-21).

165.   Defendant Gladitz disrespectfully told Ms. Sharpe: "**You swung the fucking chain at my face you bitch.**" (Gladitz Dep. 80:4-14; Audio Tape and Audio Tape Transcript pg. 2).

166.   Gladitz supported the prosecution of the criminal charges made Ms. Sharpe. (Gladitz Dep. 89- 91, 93).

41

167.    Gladitz supported the prosecution of the criminal charges made Ms. Sharpe. (Gladitz Dep. 89- 91).

168.    Such support included testifying on behalf of the prosecution against Ms. Sharpe. (Gladitz Dep. 99:8- 20).

169.    Ms. Shape was acquitted of all criminal charges. (Gladitz Dep. 88:5- 11).

170.    Gladitz does not know if Volpe witnessed Ms. Sharpe allegedly swinging the chain at Gladitz. (Gladitz Dep. 108:6- 23).

171.    Gladitz was charged with a violation of department rules due to his wrongful actions against Ms. Sharpe.  (Gladitz Dep. 132:21-24).

172.    Gladitz was charged with violating department rules because he called Ms. Sharpe a "bitch", used other obscenities and made a comment that they "were frozen" during the wrongful encounter. (Gladitz Dep. 133-134; Audio Tape Transcript pg. 2).

173.    Gladitz used obscenities, called Ms. Sharpe a "bitch", and used condescending language towards Ms. Sharpe after putting her in handcuffs. (Gladitz Dep. 146:14-23; Audio Tape Transcript pg. 2).

174.    As a result of his violations, the department sent Defendant Gladitz for retraining. (Gladitz Dep. 135:22-24).

175.    Gladitz did not lose any vacation days or personal days, nor was he sanctioned in any financially impactful way as a result of his wrongful actions and departmental violations. (Gladitz Dep. 135:11- 17).

176.    A civilian complaint was lodged against Defendant Gladitz because the testimony he offered during Ms. Sharpe's criminal trial was inconsistent with the harassment that Ms. Sharpe

42

actually experienced. (Gladitz Dep. 137:19- 138:6).

177.    There was a finding that officers Volpe, Sharpe and Gladitz "engaged in conduct unbecoming an officer when they used obscenities and condescending language toward each other and made unprofessional comments on the evening of November 29, 2013.". (Gladitz Dep. 145:6-19).

178.    Defendant Gladitz said he did not call Ms. Sharpe sweetheart and that he thinks Defendant Volpe did. (Gladitz Dep. 149:12- 150:3).

179.    Defendant Gladitz has multiple civilian complaints against him, which include but are not limited to using vulgarities, and yelling at and/or intimidating his in law's neighbor Lori Hanson. (Gladitz Dep. 158-160, 169-170).

**The undisputed facts from Defendant Volpe**

180.    Defendant Volpe currently has an open civil suit against Nassau County. (Volpe Dep. 13:17-25, 14:2).

181.    Defendant Volpe stated that after he told Ms. Sharpe to roll her window down they got into an argument. This was the first interaction between Ms. Sharpe and Volpe.(Volpe Dep. 27:13- 25).

182.    Ms. Sharpe informed Volpe that she was a cop, like himself. (Volpe Dep 28:10-12).

183.    During his deposition, officer Volpe described Ms. Sharpe as "belligerent." (*Id*).

184.    Defendant Volpe does not recall exactly what Plaintiff said when she came to the window of his car or how she said it. (*People v. Sharpe* Hearing dated July 10, 2014, pp.60).

185.    Defendant Volpe did not like Plaintiff's speech. (*People v. Sharpe* Hearing dated July 10, 2014, pp.60).

43

186.     Plaintiff's speech got Defendant Volpe upset. (*People v. Sharpe* Hearing dated July 10, 2014, pp.61).

187.     Defendant Volpe does not recall whether he was going to give Ms. Sharpe a ticket or not for tinted windows. (Volpe Dep. 32:12- 16).

188.     Defendant Volpe, through his personal cell phone or the police system in his car, then contacted officer Gladitz and summarized his interactions with Ms. Sharpe. (Volpe Dep. 39:25- 40:4).

189.     After a second interaction with Ms. Sharpe, Defendant Volpe drove "towards the relieving point of 507's post, which is where Officer Gladitz was." (Volpe Dep. 37:17-24).

190.     After meeting Gladitz at the firehouse, Volpe stated that there was a decision made by one or both them to go back where the interactions with Ms. Sharpe occurred. (Volpe Dep. 43).

191.     Volpe never wrote in his memo book that he met with Gladitz at the firehouse although he did write about the criminal mischief and alleged VTL violation. (Volpe Dep. 151).

192.     Volpe stated that he wanted to show Gladitz where the interaction occurred. (Volpe Dep. 43).

193.     However, Volpe stated that he went back to the Dollar Tree "probably looking for [Ms. Sharpe]." (Volpe Dep. 44:25- 45:7).

194.     Volpe never went in the parking lot where the initial interactions with Ms. Sharpe occurred. (Volpe Dep. 46).

195.     When Volpe saw Ms. Sharpe come out of the parking lot, he told Gladitz that he was going to again gather information to prove that Ms. Sharpe was an officer. This would be the third interaction. (Volpe Dep. 50:4- 12).

196.    Only discussing these decisions with Gladitz, Volpe never contacted headquarters or a supervisor up until this point. (Volpe Dep. 50- 51).

197.    Rather than following his training, Volpe stopped Ms. Sharpe without notifying anyone in his command. (Volpe Dep. 60- 61, 76-77).

198.    Volpe grabbed Ms. Sharpe's ID from her. (Volpe Dep. 76:12- 14).

199.    Volpe stated that he and Gladitz was putting handcuffs on Ms. Sharpe to place her in custody. (Volpe Dep. 83).

200.    After placing Ms. Sharpe in "custody," Defendants Volpe and Gladitz finally called a supervisor. (Volpe Dep. 84: 20-25).

201.    Defendant Volpe would then wrongfully call Ms. Sharpe **"sweetheart"** because she was a woman. (Volpe Dep. 87:21- 23, 88:18- 20, 163; Audio Tape and Audio Tape Transcript pg. 3).

202.    Volpe was the charging officer in multiple criminal charges against Ms. Sharpe as a result of Defendants wrongful stop. (Volpe Dep. 98: 3- 6).

203.    Volpe never tested Ms. Sharpe's windows or handed her a ticket and/or summons for the alleged unlawful tinted windows. (Volpe Dep. 114, 116:10-12).

204.    Volpe was charging Ms. Sharpe with resisting arrest, tinted windows and harassment. (Volpe Dep. 131:15- 22).

205.    Volpe never actually saw Ms. Sharpe swing a chain at Officer Gladitz, even though that is what he swore occurred. (Volpe Dep. 121-127).

206.    Defendants Volpe and Gladitz, as well as Ms. Sharpe was charged with conduct unbecoming of an officer. (Volpe Dep. 159- 160).

45

207.    Volpe has several civilian complaints against him. (Volpe Dep. 207:15- 20).

208.    One such civilian complaint made by William Harris against Volpe for him being rude and unprofessional. (Volpe Dep. 209- 211).

209.    Another civilian complaint, made by Katrine Shostak, was in reference to Volpe once again yelling and being unprofessional. (Volpe Dep. 214).

210.    There was another civilian complaint lodged against Volpe by Kamal Morrison for his aggressive and unprofessional conduct towards Morrison. (Volpe Dep. 215).

211.    Volpe asserts that now Commissioner Ryder called Ms. Sharpe **"a fucking nigger"** and that "he couldn't believe [Volpe] blew the [criminal] case [against Ms. Sharpe]." (Volpe Dep. 226:4- 7).

212.    Volpe stated Ryder used the racial slur against Ms. Sharpe after the Ms. Sharpe's criminal trial ended. (Volpe Dep. 230- 231).

213.    Volpe did not report the racial slur made by Ryder in fear of retribution and retaliation by Nassau County Police Department. (Volpe Dep. 231-232).

214.    Volpe states that whether Ms. Sharpe showed him her police badge and identification is in factual dispute. (Volpe Dep. 255:13- 23).

215.    Volpe pursued charges against and testified against Ms. Sharpe for the prosecution during her criminal trial. (Volpe Dep. 261, 268-269).

216.    Volpe testified against Ms. Sharpe for the prosecution against Ms. Sharpe during her criminal trial. (Volpe Dep. 268-269).

217.    Even though Volpe saw Ms. Sharpe's allegedly illegally tinted windows when she got out the her car in the Dollar Tree parking lot, he did not give her a ticket at that time. *(People v.*

*Sharpe* Hearing dated July 10, 2014, pp.44-45).

218.   Before Volpe did anything regarding Ms. Sharpe, he had an indication that she was a police officer. (*People v. Sharpe* Hearing dated July 10, 2014, pp.46).

219.   Although Volpe was aware that Ms. Sharpe had indicated that she was a police officer, he allowed Ms. Sharpe to get in her vehicle, exit the parking lot in her vehicle, in which he subsequently followed her car and then pulled her over. (*People v. Sharpe* Hearing dated July 10, 2014, pp.50-1).

220.   At no point did Volpe ever put in writing that he had the interactions with Ms. Sharpe in the parking lot. (*People v. Sharpe* Hearing dated July 10, 2014, pp.56).

221.   Volpe initiated physical contact with Ms. Sharpe. (*People v. Sharpe* Hearing dated July 10, 2014, pp.86).

222.   At the time he pulled Plaintiff over he did not give her any instruction to remain in the car before she emerged from her car.  (*People v. Sharpe* Hearing dated July 10, 2014, pp.79).

223.   It was not as though Plaintiff was disobeying an instruction for her to stay in her car when she emerged.  (*People v. Sharpe* Hearing dated July 10, 2014, pp.79).

224.   When Plaintiff emerged from her car she stated, "I already told you I'm a Cop" (*People v. Sharpe* Hearing dated July 10, 2014, pp.80).

225.   To Defendant Volpe, her statement was confirming that she had told him that she was a member of the service. (*People v. Sharpe* Hearing dated July 10, 2014, pp.80).

**Undisputed Facts regarding Ms. Sharpe's Credentials**

226.   Ms. Sharpe has an illustrious and resume as a Nassau County Police Officer. (*See* Dolores Sharpe's Resume).

47

227.    During her 20 year career as a Nassau County Police Officer, in addition to patrol, she has worked as an Investigator in the Applicant Investigations Unit, the Recruitment department, Community Affairs, as a School Resource Officer and a Precinct Summons Clerk. (*Id.*).

228.    In addition to those accomplishments, Ms. Sharpe also served as a United States Department of Justice (USDJ) Certified G.R.E.A.T. Instructor, USDJ Certified D.E.F.Y. Mentor, USDJ Certified Weed and Seed Coordinator as well as a patrol officer. (*Id.*).

229.    Prior to serving 20 years as a Nassau County Police Officer, Ms. Sharpe was a City University of New York (CUNY) Peace Officer Level III Armed Sergeant, served in the United States Air Force for four years and was a United Nations Diplomat Protection Officer. (*Id.*)

230.    Furthermore, Ms. Sharpe's controlled and calm demeanor has allowed her to serve residents of Nassau County in ways including but not limited to: Community Affairs in schools and at senior events and Court Liaison in the District Court. (*Letter to Commissioner Thomas V. Dale*, dated December 2, 2013).

231.    Ms. Sharpe also worked prestigious details such as the Presidential Debate of 2012 and the Black Course at Bethpage for the Open. (*Id.*).

**The undisputed facts from Plaintiff Sharpe**

232.    After driving into the parking lot on Mayfair Avenue and preparing to park, Ms. Sharpe was stopped by Defendant Volpe who indicated that she should roll her window down. Ms. Sharpe complied. (Sharpe Dep. 36).

233.    When Ms. Sharpe complied and rolled her window down, Defendant Volpe indicated that Ms. Sharpe was obstructing his view of his investigation. Ms. Sharpe responded that she was not trying to obstruct the investigation and was only trying to park (Sharpe Dep. 37:7-11, 22-23).

234.    After parking her vehicle Ms. Sharpe began to walk towards the store in which she was going to shop.  She was near the entrance of the store when "I heard an individual behind me, very roughly. Yo. Yo. Yo, you. And as I turned to see who was saying that and to whom they were addressing it to, I then noticed that was Officer Volpe, the same officer that I had just seen while trying to park, operating 504, indicating for me -- with his window fully down -- to come over to the RMP." (Sharpe Dep. 38:20-25; 39:2-3).

235.    Defendant Volpe's manner of speaking to Ms. Sharpe was such that he "barked the words out" at Ms. Sharpe.  Ms Sharpe stated in her deposition "If you're going to speak to a person, a human being, another person, you don't yo, yo, you. We're all adults."  (Sharpe Dep. 39:8-11).

236.    Despite Defendant Volpe's tone, Ms. Sharpe walked over to his vehicle.  (Sharpe Dep.40:9-14).

237.    In response to defendant Volpe's comment that Ms. Sharpe "needs to pull over" the next time she sees a police car, Ms. Sharpe displayed her police shield and identification , identified herself as a police officer, and offered to assist officer Volpe with whatever investigation he was involved in.  (Sharpe Dep. 40:24-25; 41:2-12; 43:14-25; 44:2-3).

238.    Defendant Volpe then told Ms. Sharpe that he does not care who the fuck she was or what the fuck she did.  (Sharpe Dep. 41:12-13, 69:18-21).

239.    Ms. Sharpe responded that if that is the way he speaks to Members of Service, then fuck you or fuck you too.  (Sharpe Dep. 41:14-15; 45:21-25).

240.    Defendant Volpe then responded to Ms. Sharpe by saying to her, "that is why you get no respect, you fucking moron." (Sharpe Dep. 41:20-22).

241.    Ms. Sharpe did as she was trained to do.  "At the point in time when we were in the parking lot, when I showed Officer Volpe my ID and my badge, there would have been an opportunity for him to say do you have your weapon on you or are you -- are you a police officer. Take my ID, really verify. He did not.  So I showed my ID, I did what I was trained to do -- show my ID -- and I thought that the whole situation was said and done.  (Sharpe Dep. 86:15-24).

242.    After completing her shopping and walking back to her car, Ms. Sharpe did not notice any police cars in the parking lot.  (Sharpe Dep. 46:25; 47:2-5).

243.    Upon exiting the parking lot and turning onto the adjacent street, Ms. Sharpe observed flashing police lights behind her and immediately pulled over to the right shoulder of Mayfair Avenue.  (Sharpe Dep. 48:6-16).

244.    Once Ms. Sharpe pulled over, she realized it was the same police vehicle driven by Defendant Volpe whom she previously identified herself to as a fellow police officer.  Ms. Sharpe then exited her vehicle to learn why the officer was pulling her over.  (Sharpe Dep. 49:2-10; 51:16-19).

245.    Before Ms. Sharpe reached the rear wheel of her vehicle, she was forcefully grabbed by Defendant Gladitz by the forearms and pushed back against her own vehicle.  (Sharpe Dep. 49:11-16, 20-25; 50:2-6; 53:2-6).

246.    At that time Defendant Volpe was also standing outside of his vehicle.  (Sharpe Dep. 51:8-12).

247.    As Defendant Gladitz  begins pinning Ms. Sharpe against her vehicle, Ms. Sharpe asks Defendant Volpe "why are you doing this to me, I just identified who I am, and I am a member of service".  (Sharpe Dep. 52:2-6; 68:9-15).

248. Defendant Gladitz replied to Ms. Sharpe's question by pushing her against the car and stating "I don't know who you are." (Sharpe Dep. 52:6-8).

249. While being restrained by Defendant Gladitz, Ms. Sharpe continued to inform Defendants Volpe and Gladitz of her identity. "I kept explaining to both of the officers that I am a member of service, at which point there was an exchange with Officer Volpe that he didn't believe that I was an officer. He didn't know that I was an officer." (Sharpe Dep. 53:16-20).

250. "There was an exchange between myself and Officer Volpe. I'm still attesting to the fact that I am a member of service. I showed him my ID previously. I explained that to Officer Gladitz, and at some point in time within that exchange, Officer Volpe asked for my -- my credentials." (Sharpe Dep. 54:6-12).

251. Ms. Sharpe explained to defendants Volpe and Gladitz that her badge was in her right front pocket of her coat and she would need to remove the identification in order to show it to defendants. (Sharpe Dep. 54:18-21).

252. Defendant Gladitz, with his hands on top of Ms. Sharpe's hands, allowed Ms. Sharpe to reach into her coat and retrieve her badge. (Sharpe Dep. 55:7-8).

253. When Ms. Sharpe holds her identification up for defendants to see, while Defendant Gladitz is still holding Ms. Sharpe by the forearms, Defendant Volpe reached over defendant Gladitz' left shoulder and grabbed the badge and identification from Ms. Sharpe's hand. (Sharpe Dep. 55:21-24; 56:14-18,25; 57:2-3).

254. Once Defendant Volpe grabbed Ms. Sharpe's badge, he snatched the badge with such force that he broke the portion holding the badge from the chain to which it was attached. (Sharpe Dep. 58:6-7, 21-23).

255.     Ms. Sharpe replaced the thin chain that came with the identification holder with a stronger sturdier chain. "It was a -- it was a herringbone chain, silver -- sterling silver chain that I got specifically for that holder. (Sharpe Dep. 59:9-11; 61:14-20).

256.     After Defendant Volpe snatched Ms. Sharpe's identification and returns to his patrol car, he indicates to Defendant Gladitz that he should find out what else Ms. Sharpe has.  (Sharpe Dep. 62:17-19).

257.     At that point, Defendant Gladitz, still with his hands forcefully on Ms. Sharpe's forearms forcibly removes her hands from her pocket. (Sharpe Dep. 62:21-25).

258.     When Defendant Volpe snatched Ms. Sharpe's badge and separated the badge from her chain, the chain remained in Ms. Sharpe's possession.  Ms. Sharpe kept the chain in her pocket, mostly wrapped around her hand, until Defendant Gladitz removed her hand from her pocket. (Sharpe Dep. P. 63; 64:2-5).

259.     Once Defendant Gladitz removed Ms. Sharpe's hand from her pocket, Defendant Gladitz again cursed at Ms. Sharpe and exclaimed that Ms. Sharpe tried to hit him.  "He calls me a bitch and says that I attempted to hit him with my chain." (Sharpe Dep. 64:7-9).

260.     Ms. Sharpe received training in the police academy as well as following the police academy in police encounters between on and off duty police officers.  (Sharpe Dep. 70:3-12).

261.     As part of that training, Ms. Sharpe learned to immediately identify herself as a police officer when off-duty and to show her identification to support the fact that she was a police officer. (Sharpe Dep. 70:13-21.)

262.     When asked whether she was ever told about accepting the word of an individual that they were a police officer, Ms. Sharpe responded with the following, indicating that she and

52

Defendants Volpe and Gladitz received the same training.   Sharpe Dep. Page 71

> Q: Sure. Were you told at any point that if you are the on-duty officer, that you are not to simply accept the word of someone that they are, in fact, also a police officer or a member of service?

> A: It actually would -- would really vary as to what the circumstance is. If -- if there is a situation that there was a crime that had happened and someone is telling me that they are a police officer, I would pretty much want to have clear identification. However, in this instance, this was a very different circumstance. I had done nothing wrong. I was a shopper for Black Friday going to a store, and I was harassed and followed by an officer who -- for whatever reason -- felt necessary to come after me after I had already identified myself to him as a police officer. He had an opportunity at the time when I did show him to inquire further. He chose to curse at me and call me a fucking moron.
> So -- so the same training that I had, those officer also had. And their training, obviously they didn't adhere to -- to the -- to anything.
> (Sharpe Dep. 71: 4-8, 11-25; 72:2-6.)

263.    Once Sergeant Boyce, arrived at the scene, Ms. Sharpe's handcuffs were immediately

removed.  (Sharp Dep. 90:19-23)

Dated: Hempstead, New York
       June 3, 2022

Respectfully submitted,

LAW OFFICES OF
FREDERICK K. BREWINGTON

By: _____

FREDERICK K. BREWINGTON
*Attorneys for Plaintiff*
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959